In re WHITING POOLS, INC., Debtor.

UNITED STATES of America, Plaintiff,

v.

WHITING POOLS, INC., Defendant.

Bankruptcy Nos. 81–20063, 81–2034A.

United States Bankruptcy Court,
W. D. New York.

April 28, 1981.

Jonathan B. Forman, Civil Trial Section, Northern Region Tax Division, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Relin & Goldstein by Lloyd H. Relin, Rochester, N. Y., for defendant.

Harter, Secrest & Emery by Deborah Schwind, Rochester, N. Y., for Marine Midland Bank.

## MEMORANDUM AND DECISION

EDWARD D. HAYES, Bankruptcy Judge.

The United States of America has commenced an action under 11 U.S.C. § 362(d) of the new Bankruptcy Code seeking a determination that the automatic stay provisions of Bankruptcy Code 11 U.S.C. § 362(a) are not applicable to it with respect to certain property seized by the Internal Revenue Service from Whiting Pools, Inc. to satisfy unpaid employment taxes; or alternatively, seeking relief from the automatic

stay provisions of 11 U.S.C. § 362 to permit the Internal Revenue Service to sell the seized property. A preliminary hearing was held within 30 days after the filing of the complaint and was continued to a final hearing. The final hearing has been held. Both parties have submitted memorandums of law and all testimony has been taken.

From the hearings, the facts appear to be as follows. Whiting Pools, Inc. filed a petition under Chapter 11 of the Bankruptcy Code on or about January 15, 1981. Whiting Pools, Inc., the debtor in this proceeding, is engaged in the business of selling, installing and servicing swimming pools. It also retails pool equipment and supplies from its place of business at 7244 Palmyra Road, Fairport, New York. On January 14, 1981, the United States acting through the Internal Revenue Service seized all of the debtor's property at its place of business. The seizure included nearly all of the debtor's tangible property. The United States proposes to sell this property at public auction or otherwise in accordance with sections 6331 et seq. of the Internal Revenue Code. It is seeking the permission of this Court to conduct such a sale. The property seized includes equipment, vehicles, inventory, office equipment and supplies. The United States claims to be owed approximately $92,000 in back employment taxes.

The issues presented to the Court are: First, can the Internal Revenue Service proceed with its sale of the seized property without permission of the Bankruptcy Court; second, if the Service is bound by the provisions of 11 U.S.C. § 362(a), should the stay be lifted pursuant to § 362(d); and third, if the stay is continued, can this Court order the Service to turn over the seized property to the debtor so that rehabilitation of the debtor can be effected. Each of these issues will be addressed in turn.

■ Whether the Service needs permission of this Court to proceed with its sale of the debtor's property depends on the applicability of the automatic stay provisions of 11 U.S.C. § 362. Section 362(a) provides in pertinent part as follows:

362(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title operates as a stay, applicable to all entities, of—

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title:

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title; . . .

The automatic stay applies to the Service under either of these paragraphs. The seized property, although in the custody of the Service, is, nevertheless, property of the debtor. Title to the property never passed to the Service or to anyone else. Any doubt about the debtor's continued ownership of the property is soon dispelled upon the reading of § 6335 of the Internal Revenue Code of 1954 which provides for the sale of seized property. That section repeatedly refers to the taxpayer as the *owner* of the property. Therefore, paragraph 5 clearly applies in this case. Furthermore, even if the seizure had divested the debtor of title to the property, paragraph 6 would prevent the Service from unilaterally exercising its right to sell the property since such a sale would constitute an act to collect a claim against the debtor. *See In re Avery Health Center, Inc.,* Civil Action No. 81–51E, BK 81–10130, 3 CBC 728, 8 B.R. 1016 (Bkrtcy. W.D.N.Y.1981).

■ Having decided that the automatic stay is applicable to the Service with respect to the seized property we must now consider whether the stay should be continued or lifted. Here, the relevant section of the Code is § 362(d) which provides as follows:

362(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

It is readily apparent that the Service cannot succeed in lifting the stay under paragraph 2. The hearings required by 11 U.S.C. § 362(d) have been held and this Court finds with regard to those hearings that the property of the debtor is worth $162,876 as a going concern and that the only liens against that property are a tax lien of $92,000 and Marine Midland's security interest which is either $6,000 or $12,500 depending upon the outcome of litigation which involves parties not before this Court. Thus, the provisions of subparagraph A are not met since the debtor has substantial equity in the property.

Furthermore, the seized property is absolutely necessary to an effective reorganization of the debtor. The Service has seized virtually everything this debtor owns. If the stay is lifted and the sale occurs, the debtor will cease to exist. Therefore, even if the debtor had no equity in the seized property, the stay could not be lifted pursuant to paragraph 2 since the provision of subparagraph B cannot be satisfied.

Therefore, the Service must show cause, pursuant to paragraph 1, why the stay should be lifted. The sole cause advanced by the Service is that the United States is incurring rent of $2,500 per month while it waits to sell the property.

Taking into account the testimony adduced by the Service, their forced sale (the proceeds of which are subject to prior lien) will probably net a maximum of $30 to $35,000 and the more probable recovery will be in the neighborhood of $20,000. The extra expense incurred as a result of the stay of sale is substantial in light of the minimal recovery expected from the forced sale.

Significantly, the Service has not argued that it lacks adequate protection for the harm wrought by the imposition or continuation of the stay. Apparently, the reason for this is that a business without access to its property is in no position to offer such protection and it would be inconsistent for the Service to hold the property and demand protection at the same time.

It is abundantly clear to this Court that the United States' interest in the property can adequately be protected if the debtor's property is returned to it and its business is recommenced. This Court also feels that such a turnover is in the best interests of both parties and would accomplish the purpose of both the Bankruptcy and Internal Revenue Codes. The United States can realize more on its tax claim from the income of a revitalized business than from the proceeds of a forced sale. Nevertheless, the Service insists that it be permitted to sell the property at auction and further insists that this Court cannot order a turnover of pre-petition seized property. Since it makes little sense to continue the stay unless a turnover of property can accompany the stay, we now turn to the most critical issue of this case; *i. e.*, the power of a Bankruptcy Court to order the turnover of property in the hands of a creditor incident to the enforcement of a lien.

To begin with, the question of whether property seized by the Service prior to the filing of a bankruptcy petition is property of the estate as defined by § 541 of the Code and thus subject to the turnover provisions of § 542 has already been addressed in this district. *In the Matter of Avery Health Center, Inc.*, 3 CBC 728, 8 B.R. 1016 (Bkrtcy.W.D.N.Y.1981) Judge Elfin concluded that only those property interests remaining in the debtor at the time it filed its petition could be considered property of the estate as defined by § 541. Having found that the debtor was not entitled to use, lease, or otherwise possess the seized property at the time it filed its petition, Judge Elfin held that "the IRS may not be ordered to turn over the levied property under § 542 of the Bankruptcy Code." *Id.* at 732, 8 B.R. 1016.

Judge Elfin approached the problem by considering in turn § 542, § 363 and § 541. His attention was focused primarily on § 541 and he held close to the clear, plain and literal terms of that section. Simple logic, operating on the plain language of the Code and the information available to him, necessarily led him to the conclusion he reached.

This Court cannot argue with Judge Elfin's logic but neither can it accept an interpretation of the Code that strips a reorganization court of the power to order a turnover of pre-petition seized property necessary to the successful rehabilitation of Chapter 11 debtors. Such power was lodged in this Court under the Act and Congress could not have intended to limit that power when it enacted the Code.

Under the Act, the source of the Court's power to order the turnover of property was § 2(a)(21), which, in Chapter X cases was supplemented by § 257. Clause 21 required receivers or trustees appointed in other proceedings, assignees for the benefit of creditors and liquidation agents to turn over to the trustee in bankruptcy all property that was the property of the debtor before it came into the hands of such receiver, trustee or assignee.

In cases arising under this section, the courts distinguished between "equity receivers" and "foreclosure receivers". *See Emil v. Hanley*, 318 U.S. 515, 63 S.Ct. 687, 87 L.Ed. 954 (1942) and *Tuttle v. Harris*, 297 U.S. 225, 56 S.Ct. 416, 80 L.Ed.2d 564 (1935). Essentially, the former was a receiver, trustee, assignee or agent who held the debtor's property for the benefit of creditors generally. The latter were entities who had possession of the debtor's property incident to the enforcement of a lien.

Another distinction drawn, not only by the courts but by the Act itself, was the different treatment of property in the hands of a "foreclosure receiver" depending on whether the proceedings at bar contemplated reorganization or straight bankruptcy. In straight bankruptcy, only property in the hands of an "equity receiver" was subject to the turnover provisions of § 2(a)(21), *Emil v. Hanley, supra.* Property held by or for a creditor incident to the enforcement of a lien was not reachable by the trustee in bankruptcy unless he could successfully challenge the validity of the underlying lien in a plenary suit. *Phelps v. United States*, 421 U.S. 330, 95 S.Ct. 1728, 44 L.E.2d 201 (1975).

On the other hand, in reorganization cases, § 2(a)(21) was read in conjunction with § 257. Section 257, which applied only to Chapter X cases, provided:

> § 257. The trustee appointed under this chapter, upon his qualification, or if a debtor is continued in possession, the debtor, shall become vested with the rights, if any, of such prior receiver or trustee in such property and with the right to the immediate possession thereof. *The trustee or debtor in possession shall also have the right to immediate possession of all property of the debtor in the possession of a trustee under a trust deed or a mortgagee under a mortgage.* (Emphasis added)

It was the intent of Congress in enacting this section to make clear the inapplicability under Chapter X of the equity-foreclosure distinction. *Reconstruction Finance Corp. v. Kaplan*, 185 F.2d 791, 795 (1st Cir. 1950). Thus, in reorganization cases, not only was property in the hands of an "equity receiver" subject to the turnover provisions of § 2(a)(21) but so also was the property in the possession of "foreclosure trustees". *Emil v. Hanley, supra* 318 U.S. at 522, 63 S.Ct. at 691. The reason for this is obvious. In order to undertake successfully the rehabilitation of a corporate debtor it was necessary that a reorganization court be empowered to take possession of all the debtor's property wherever located and regardless of the nature of the debtor's possession. *See generally*, Collier (14th Ed.) ¶ 14.03; *see also, In Re Prudence-Bonds Corp.*, 77 F.2d 328 (2d Cir. 1935).

Thus, at least since the enactment of § 257, it has been firmly established that a reorganization court is empowered to order the turnover of property in the hands of a

trustee or receiver incident to the enforcement of a lien. *Emil v. Hanley, supra.* It was also well established that the turnover provisions were not limited to property in the hands of court appointed officers having the title of "trustee" or "receiver" or "agent". Creditors in possession of the debtor's property incident to enforcement of a lien came within the meaning of "foreclosure receiver". *See Reconstruction Finance Corp. v. Kaplan, supra; In re Franklin Garden Apartments,* 124 F.2d 451 (2d Cir. 1941); and *In re Third Avenue Transit Corp.,* 198 F.2d 703 (2d Cir. 1952). This was the state of the law prior to the enactment of the new Code. Where did these broad turnover powers go when the Act was repealed and the Code went into effect?

Section 542 and 543 are the only express turnover provisions in the new Code. SInce the *Avery* case has rendered the former inapplicable, the applicability of the latter must now be determined. Section 543 applies only to property in the hands of custodians and provides in part as follows:

§ 543(b)  A custodian shall—

(1) deliver to the trustee any property of the debtor transferred to such custodian, or proceeds of such property, that is in such custodians possession, custody or control on the date that such custodian acquires knowledge of the commencement of the case...

Whether § 543 applies to the Service in a case such as ours turns on whether the Service is a custodian within the meaning of § 101(10) which provides in pertinent part:

§ 101(10)  "custodian" means—

(c) trustee, receiver, or agent under applicable law, or under a contract, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or for the purpose of general administration of such property for the benefit of the debtors' creditors

For the purposes of our case the essential terms of clause (C) are these: A custodian includes an agent under applicable law authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property. There is a familiar ring to this language. This definition of custodian, in one of its aspects, appears to be the latter-day description of a "foreclosure trustee". It would appear, therefore, that one type of entity subject to the turnover provision of § 543 is the same kind of entity treated as a "foreclosure trustee" in cases decided under the Act.

As has already been observed, these entities included mortgagees, under a mortgage, pledgees pursuant to a factor lien agreement, trustee under a trust deed and the like. Is there any distinction worth drawing between the Service in possession of seized property and a mortgagee in possession of property under a mortgage? This Court thinks not. When the Service filed its tax lien it became, in effect, a lien creditor with respect to all of the debtor's property. By seizing the property, the Service did not change the nature of its interest from a lien interest to ownership; all it did was take another step in the process of enforcing its lien.

The United States' reliance on *Phelps v. United States,* 421 U.S. 370, 95 S.Ct. 1396, 44 L.Ed.2d 201 (1975) in support of its contention that seizure is tantamount to ownership, is misplaced. All the courts that have addressed the issue at bar have distinguished *Phelps* on the ground that it only dealt with the old summary vs plenary jurisdiction of the bankruptcy courts under the Act. But *Phelps* is inapposite for another, more important reason.

The *Phelps* court was dealing with a straight bankruptcy case, not a reorganization case. As was discussed above, property in the hands of a "foreclosure trustee" could not be the subject of a turnover order in straight bankruptcy. In effect, the *Phelps* court held that the assignee in that case was holding the disputed funds not as a mere naked bailee for creditors generally (i. e. equity receiver) but as a custodian for the United States, a bona fide adverse claimant (i. e. "foreclosure trustee").

*Phelps* at 337, 95 S.Ct. at 1732. All the talk about "ownership" cropped up in the context of the courts jurisdiction, vel non, over property in the hands of, or being held for, an adverse claimant. In Chapter IV this was a crucial issue. *See generally* Collier (14th Ed.) ¶ 23.06 p. 494 *et seq.* Under Chapter X, the nature of a claimant's (or debtor's) possession was rendered largely irrelevant by § 257 and other provisions of the Act that gave a reorganization court expanded jurisdiction and extra powers that were considered neither necessary nor appropriate in Chapter IV cases. *See, Emil v. Hanley, supra.* Therefore, any language in *Phelps* that can be construed to mean that ownership of the seized property passed from the debtor to the Service is dicta merely and is completely inapplicable to the case at bar. Once we shed all the "tantamount to ownership" talk and the related exercise of balancing the respective rights of the Service and the debtor in the seized property, what remains is this:

The Service has *custody* of the debtor's property incident to the enforcement of its lien. Certainly, the Service has a very substantial interest in the seized property, but no more so than a mortgagee foreclosing upon real property of a debtor who has a receiver appointed to take possession of the property prior to the filing of a petition. The fact that the Service itself has custody of the debtor's property and not a court-appointed officer is of no consequence. Therefore, the Service in possession of prepetition seized property must be considered a custodian within the meaning of § 101(10)(C) and thus subject to the turnover provisions of § 543.

■ The only question remaining is whether this court should order the turnover of the seized property or excuse compliance pursuant to § 543(d). In deciding this question, the pre-code cases again are instructive. Under the Act, the powers given a bankruptcy court by § 257 were considered drastic powers to be exercised only in the most "extraordinary circumstances". *In re Third Avenue Transit Corp., supra* at 706; *see also RFC v. Kaplan, supra; In re*

*Franklin Garden Apartments, supra.* In the *Third Avenue Transit* case, the Second Circuit Court of Appeals established the following guidelines for determining what was an appropriate case for a turnover order:

1. The use of the property must be necessary to the successful rehabilitation of the debtor,

2. The debtor can be reorganized in accordance with the Act within a reasonable period of time, and

3. The entity that is being dispossessed of its security will not be injured thereby.

If these guidelines are applied to the case at bar, it is seen that the use of the seized property is absolutely necessary to the debtor's survival. Without the use of its equipment, inventory and other items seized by the Service, surely the debtor must fold. From testimony taken at the hearings, the preliminary hearing and the final hearing, it appears that the debtor has a reasonable chance to reorganize and become a profitable business again. But a turnover of the seized property should not be ordered if the United States will be injured thereby. The debtor abused a fiduciary duty of the highest order when it failed to pay the taxes it withheld from its employees' wages and the ability of the Service to recover those taxes should not unreasonably be impaired.

It is important to note here that unlike § 542, § 543 does not expressly provide for adequate protection. Section 543(d) literally applied, would seem to permit either an unconditional turnover or maintenance of the status quo depending on which course best serves the interests of creditors. In this case, such a literal interpretation creates an intolerable dilemma. For this reason, § 542 would seem the more appropriate section for resolving the controversy at bar because it incorporates by reference the terms of § 363(e) which permits a court to condition any turnover order upon the ability of the debtor to give adequate protection. *See* Collier (15th Ed.) ¶ 363.04 at 362–23 (illustrating the treatment under the Code of the *RFC v. Kaplan* scenario and discussing the interrelationship of §§ 542, 363 and 362).

In any event, the ability of this Court to fashion a just remedy should not be limited by reading § 543(d) too literally. Whether the courts' turnover power is properly found in §§ 542, 543 or even § 105 (to carry out the purpose of the automatic stay as was the case in *RFC v. Kaplan*) the Court must have the concomitant power to require adequate protection.

Therefore, to accomplish the purposes of both the Bankruptcy and Internal Revenue Codes, the Service must release the seized property to the debtor-in-possession upon the following conditions:

1. That the debtor-in-possession pay IRS as adequate protection under 11 U.S.C. § 361 the sum of $20,000 before the turnover occurs, and

2. That the debtor shall pay to IRS the sum of $1,000 a month until the tax is paid, and

3. That during this period of time IRS shall retain its lien upon the property seized, and

4. That if the debtor fails to make the payments required when IRS turns over the property, the stay shall be lifted, and it is so ordered.